*PREVIOUSLY CLEARED BY CSO FOR PUBLIC FILING*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE:<br><br>GUANTANAMO BAY<br>DETAINEE LITIGATION | : Misc. No. 08-442 (TFH)<br>:<br>: Civil Action No. 05-1509 (RMU)<br>: Civil Action No. 05-1602 (RMU)<br>: Civil Action No. 05-1704 (RMU)<br>: Civil Action No. 05-2386 (RMU) |

**PETITIONERS' MOTION FOR TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION**

Petitioners are six Uighur men imprisoned at Guantanamo Bay Naval Station, Cuba ("JTF-GTMO") [1]. Petitioners hereby move for a temporary restraining order and a preliminary injunction pending resolution of these *habeas* petitions, restraining and enjoining Respondents from detaining Petitioners in any but the least restrictive camp within the JTF-GTMO, without limitation, and precluding further imprisonment in the solitary confinement cells of Camps 5 and 6, or any condition of partial or total isolation. In support of this motion, Petitioners rely on the Statement of Points and Authorities in Support of Petitioners' Motion for Temporary Restraining Order and Preliminary Injunction, filed herewith.

Pursuant to Local Rule 7(m), counsel states that she has contacted Respondent's counsel and has been advised that Respondent does not consent to this motion.

As the prisoners are destitute, the Court should waive any requirement for a bond.

A grant of the relief requested herein lies within the sound discretion of the Court.

---

[1] The Uighur Petitioners herein are Hammad Memet and Khalid Ali in *Kiyemba v. Bush*, Civil Action No. 05-1509 (RMU), Petitioner Edham Mamet in *Mamet v. Bush*, Civil Action No. 05-1602 (RMU), Petitioners Bahtiyar Mahnut and Arkin Mahmud in *Kabir v. Bush*, Civil Action No. 05-1704 (RMU), and Petitioner Adel Noori in *Mohammon v. Bush*, Civil Action No. 05-2386 (RMU).

**WHEREFORE**, Petitioners pray:

1.      For an immediate hearing on this motion;

2.      For an order temporarily restraining, and then preliminarily enjoining Respondents from holding them in any prison compound other than Camp 4 of JTF-GTMO, and from holding them under any conditions of isolation or solitary confinement; and

3.      In the alternative to the relief requested in paragraph 2, above, Petitioners request that the Court order Respondents to notify the Court whether they will voluntarily consent to the relief set forth in paragraph 2, and in the event they will not, that the Court order the Petitioners transported to the Court, where they shall appear and appropriate conditions of confinement, if any, shall be imposed pending final disposition of their *habeas* petitions.

4.      Petitioners request such other and further relief as may be just and proper.

Dated: July 26, 2008

COUNSEL FOR PETITIONERS:

J. Wells Dixon(Pursuant to LCvR 83.2(g))
Wdixon@ccr-ny.org
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Telephone: (212) 614-6423
Facsimile: (212) 614-6499
*Of Counsel for all Petitioners*

Eric A. Tirschwell (Pursuant to LCvR 83.2(g))
Michael J. Sternhell (Pursuant to LCvR 83.2(g))
Darren LaVerne (Pursuant to LCvR 83.2(g))
Seema Saifee (Pursuant to LCvR 83.2(g))
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Counsel to PetitionerAdel Noori*

____/s/ Elizabeth P. Gilson_____
Elizabeth P. Gilson(Pursuant to LCvR 3.2(g))
egilson@snet.net
383 Orange Street
New Haven, CT 06511
Telephone: (203) 777-4050
Facsimile: (203) 787-3259
*Counsel to Petitioners Bahtiyar Mahnut and Arkin Mahmud*

Susan Baker Manning
BINGHAM McCUTCHEN LLP
1120 20th Street NW, Suite 800
Washington, DC 20036-3406
Telephone: (202) 778-6150
Facsimile: (202) 778-6155

Sabin Willett (Pursuant to LCvR 83.2(g))
Neil McGaraghan (Pursuant to LCvR 83.2(g))
Rheba Rutkowski (Pursuant to LCvR 83.2(g))
Jason S. Pinney (Pursuant to LCvR 83.2(g))
BINGHAM McCUTCHEN LLP
One Federal Street
Boston, Massachusetts 02110
Telephone: (617) 951-8000
Facsimile: (617) 951-8736
*Counsel to Petitioners Hammad Memet, Khalid Ali, and Edham Mamet*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: | Misc. No. 08-442 (TFH) |
| GUANTANAMO BAY DETAINEE LITIGATION | Civil Action No. 05-1509 (RMU)<br>Civil Action No. 05-1602 (RMU)<br>Civil Action No. 05-1704 (RMU)<br>Civil Action No. 05-2386 (RMU) |

**[PROPOSED] ORDER GRANTING PETITIONERS' MOTION FOR**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

For the reasons set forth in Petitioners' Motion for Temporary Restraining Order and Preliminary Injunction, the Court herby GRANTS Petitioners Motion for Temporary Restraining Order and Preliminary Injunction.

1. Respondents are temporarily restrained, and preliminarily enjoined from holding Petitioners in any camp but Camp 4 of JTF-GTMO, and from holding them under any conditions of isolation or solitary confinement.

s/
RICARDO M. URBINA
United States District Judge

*CLEARED WITH CSO FOR PUBLIC FILING*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| IN RE: | : | Misc. No. 08-442 (TFH) |
| | : | |
| GUANTANAMO BAY | : | Civil Action No. 05-1509 (RMU) |
| DETAINEE LITIGATION | : | Civil Action No. 05-1602 (RMU) |
| | : | Civil Action No. 05-1704 (RMU) |
| | : | Civil Action No. 05-2386 (RMU) |

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF PETITIONERS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Pursuant to Fed. R. Civ. P. 65 and the All Writs Act, 28 U.S.C. § 1651, and pending final disposition of these *habeas corpus* petitions, Petitioners have moved for a temporary restraining order and a preliminary injunction restraining and enjoining Respondents from detaining Petitioners in Camp 5, Camp 6, or any condition of partial or total isolation, and further restraining and enjoining Respondents from detaining Petitioners in any but the least restrictive camp within JTF-GTMO.. As grounds for this relief, Petitioners state:

## I. FACTS

### A. Uighurs at Guantanamo

Petitioners herein are six of 17 Uighur prisoners held at the United States Naval Station, Guantánamo Bay, Cuba ("Guantánamo"), where they have been incarcerated since May, 2002.[1] The Uighur ("WEE-ghur") prisoners are stateless refugees from the Xinjiang Uyghur Autonomous Region, a province of the People's Republic of China (also referred to as "East

[1] 22 Uighurs in all have been sent to Guantanamo. Five of the men – whose cases presented identical issues as do Petitioners' – were released to Albania in May, 2006. By Order of the Court dated July 9, 2008 (Hogan, J.) (coordinating judge) Petitioners' petitions for *habeas corpus* were consolidated with those of 11 other Uighur prisoners remaining in Guantanamo, and are pending resolution in this Court. The 11 other men are not petitioners in this action.

Turkistan"). Uighurs are a Turkic Muslim minority group that has been, and continues to be, brutally oppressed by the communist Chinese government.

The United States government has repeatedly and publicly acknowledged that the Uighurs imprisoned at Guantánamo are not the enemy, that they do not present a threat, and that they have been eligible for release for at least four years. *See, e.g.*, Interview with Colin Powell, Secretary of State, in Washington, D.C., at 5 (Aug. 12, 2004) ("[T]he Uighurs are a difficult problem and we are trying to resolve all issues with respect to all detainees at Guantánamo. The Uighurs are not going back to China, but finding places for them is not a simple matter, but we are trying to find places for them. And we are trying to find places for them, and, of course, all candidate countries are being looked at.").[2] Indeed, five Uighur prisoners – whose cases presented identical questions as the petitioners here – were declared non-enemy combatants and were released from Guantanamo to Albania in May, 2007.

Despite the government's actions and acknowledgements that they should be freed, Petitioners remain imprisoned at Guantánamo in conditions of unbearable near-isolation, and therefore have brought this motion for injunctive relief.[3]

Camp 6 is an imposing physical concrete structure. It has no windows, and is surrounded by multiple fences, razor wire, and checkpoints guarded by MPs. In Camp 6 Petitioners are completely isolated in small 6-foot-eight-inch by 12-foot cells. The cell walls, ceiling, and floor are solid metal. The air conditioning is run throughout the day to keep these cells uncomfortably

---

[2] *See also*, Tim Golden, For Guantánamo Review Boards, Limits Abound, N.Y. Times, Dec. 31, 2006, at A20 (quoting a national security official who worked on the Uighur cases, "[W]e were shocked that they even sent those guys before the C.S.R.T.s. They had already been identified for release.")

[3] On July 2, 2008, by agreement with the government following a similar motion for injunctive relief, counsel were notified that ten Uighur men were moved from the isolation of Camp 6 to the communal facility of Camp 4, where one Uighur man was already being held. The remaining six men – who languish in Camp 6 – are the petitioners in this action. Between 2003 and 2006, most of the Uighurs had been held in Camp 4, where they lived communally in a bunk house, ate communally at picnic tables, had 24-hour access to a small outside area (and thus to sunlight and fresh air), and most significantly, had 24-hour access to each other. *See* January 20, 2007 Declaration of Sabin Willett, *Parhat v. Gates*, No. 06-1397 (D.C. Cir. Jan. 22, 2007), ¶¶ 27-29, attached hereto as Exhibit 1.

cold. The metal floors and walls conduct what little heat Petitioners may emit, and are cold to the touch. See generally, Declaration of Sabin Willett dated January 20, 2007 ("Willett Decl.¶¶ 15-18, attached as Exhibit 1.

Each cell is barren, except for a bed, toilet, sink, and metal mirror. There is no natural light or air. Petitioner Mahmud has complained that he is painfully cold in his cell. Declaration of Elizabeth P. Gilson dated July 24, 2008 ("Gilson Decl.") ¶ 5, attached as Exhibit 2. There are no windows or openings in the walls, floor, or ceiling, except strips of glass approximately four inches wide by twenty four inches high. The glass gives a view only of the interior corridor where MPs are stationed, and of a clock. There is no window to the outside. Throughout the day and night the loud churning of the HVAC system and the banging of doors in the facility echo through metal corridors and cells. Willett Decl. ¶¶ 15-18.

Petitioners have extreme difficulty sleeping, and are often awakened (purposely) by the guards in the middle of the night. Prisoners are constantly watched by MPs, as they sleep, as they eat, and as they defecate. Petitioners have no television or radio, no access to magazines or newspapers, and no way to communicate with the outside world. They have no family visits. They are imprisoned alone, they eat alone, and they pray alone. They sometimes attempt to communicate basic messages with one another by crouching at the door and yelling through a small gap between the floor and the door. A cry can be heard in the halls at times, "Are you all right?" Generally there is silence. Willett Decl.¶ 17.

Petitioners have little room to move about in cells not much larger than a closet. They are permitted to spend part of their day in a "recreation" pen: a concrete box fifteen meters by four meters, and two stories high. This box is divided into cages, each three by four meters. Willett Decl. ¶ 22. Petitioners are permitted to spend up to four hours a day in these small cages, two

men to a cage. Participating in "recreation" involves standing within the caged area and sometimes kicking a soccer ball against the fence. *Id.*

There are no similar prisons in the United States. Camp 6 is generally modeled after a super maximum or "supermax" facility. The United States employs supermax prisons to isolate and punish its most violent and dangerous offenders. Altogether, supermax facilities hold around one percent of all prisoners. *See* Jeffery Klugar, *Are Prisons Driving Prisoners Mad?* Time, Jan. 26, 2007. It is widely reported that these prisons drive their prisoners insane. *Id.* (noting that the isolation in these prisons is a type of "touchless torture").[4] *See also, Locked Up Alone – Detention Conditions and Mental Health at Guantánamo*, Human Rights Watch, June 2008, at 20 ("HRW Report"), *available at* http://www.hrw.org/reports/2008/us0608/us0608web.pdf. As a result of these conditions, prisoners within Camp 6 are reportedly becoming psychotic. *See* Suleiman al-Khalidi, *Guantanamo Conditions Said Worse*, Reuters, Jan. 26, 2007. Their days are now filled with infinite tedium and loneliness. *See* Ben Fox, *Life Harsher in New Guantanamo Unit*, WASH. POST, Feb. 3, 2007. The Uighur prisoners within Camp VI are suffering similar consequences. Gilson Declaration, ¶ 6-7. Counsel has recently learned that two of the Uighurs in Camp 6 have attempted to commit suicide. Declaration of Seema Saifee dated July 28, 2008 ("Saifee Decl.") ¶ 8, attached as Exhibit 3; All have reported grave unhappiness. Petitioner Mahmud reports that he is plagued with voices that order him to cry out. Gilson Decl. ¶ 6. A number of Petitioners have attempted to starve themselves to death. Saifee Declaration ¶¶ 9 - 11.

[4] The supermax facilities also raise serious constitutional questions. Currently, at least seven states are facing charges that their supermax facilities are a form of cruel and unusual punishment.

**B. *Parhat v. Gates*: military's "enemy combatant" determination is invalid.**

Nearly seven years after Petitioners and the other Uighurs were brought to Guantánamo, and three years after they first filed their *habeas* petitions, an Article III court – finally – held a hearing on the question of whether the Government was properly detaining these men. All 17 Uighur prisoners at Guantánamo are being held on a theory that they *allegedly* were affiliated with a group (the "East Turkistan Islamic Movement" or "ETIM") that *allegedly* was associated with al Qaida or the Taliban and *allegedly* engaged in hostilities against the U.S. or its allies.[5]

The case, *Parhat v. Gates*, No. 06-139, 2008 WL 2576977 (D.C. Cir. June 20, 2008), was brought on behalf of one of the Uighur prisoners, Huzaifa Parhat.[6] After reviewing the matter under the provisions of the Detainee Treatment Act of 2005, the United States Court of Appeals for the District of Columbia held that the military's Combatant Status Review Tribunal ("CSRT") had invalidly declared that Parhat is an enemy combatant. *Id.* at *1. The court directed the government to release or to transfer Parhat, or expeditiously to hold a new CSRT consistent with the court's opinion. *Id.* at *3.[7]

---

[5] *See, e.g.*, FOIA CSRT 3102-09 (Abdul Nassar), *Id.* at 2469-85 (Petitioner Mahnut), *Id.* at 1614-22 (Thabid), *Id.* at 1920-35 (Abdul Razakah, ISN 219), *Id.* at 2844-55 (Abdul Ghappar, ISN 281), *Id.* at 1623-30 (Abdusabour, ISN 275), *Id.* at 2909-21 (Abdusemet, ISN 295), 3151-59 (Petitioner Memet, ISN 328), *Id.* at 1505-16 (Huzaifa Parhat, ISN 320), *Id.* at 1631-44 (Jalal Jalaldin ISN 285), *Id.* at 00161-77 (Sabir Osman, ISN 282). The FOIA CSRT documents were produced by the military under a Freedom of Information Act request filed by the Associated Press, *available at* http://www.dod.mil/pubs/foi/detainees/csrt/ARB_Transcript_Set_6_.pdf.

[6] Mr. Parhat is not a petitioner for purposes of this motion; he was moved from Camp 6 to Camp 4 on July2, 2008. (See footnote 4, *supra.*)

[7] Noting the CSRT's conclusion that there was no source evidence that Parhat had ever joined ETIM, the Court declined to reach that question because of fundamental flaws in the other elements of the government's theory. *Id.* at *17-18. Specifically, the Court noted that the government's "evidence" was derived entirely from four intelligence reports describing ETIM's "activities and relationships as having 'reportedly' occurred, as being 'said to' or 'reported to' have happened, and as things that are 'suspected of' having taken place." *Id.* at *23.[7] But because the reports failed to identify any underlying source for who may have "reported," "said," or "suspected" such things, the Court found the reports inherently unreliable. *Id.* at *24. The Court held that, as a matter of law, the government's "bare assertions cannot sustain the determination that Parhat is an enemy combatant." *Id.* at *24.

## II. RESPONDENTS MUST BE RESTRAINED AND ENJOINED FROM DETAINING PETITIONERS IN SOLITARY CONFINEMENT CAMPS AND MUST TRANSFER THEM IMMEDIATELY TO MORE HUMANE CONDITIONS.

Since late 2006, Petitioners have endured conditions of almost-complete isolation at Guantanamo's Camp 6. Petitioners have suffered (and on information and belief continue to suffer) astonishingly harsh, and potentially-deadly isolation. The D.C. Circuit has now ruled that the government has failed to make a case for enemy combatant status for an individual – Parhat – who was so-classified on the *same* grounds as Petitioners here. Thus, under the existing state of the law the government has no lawful basis to detain Parhat. For the same reason, the government has no lawful basis to detain Petitioners in this action, each of whom was determined to be an enemy combatant under the same discredited rationale as was applied to Parhat.

### A. This Court's *habeas* jurisdiction gives it ample basis to grant the relief requested.

Petitioners expect shortly to move for an order directing their release, if necessary, into the United States. Petitioners expect the government to resist this request for relief. In the interim, however, the Court has broad power to fashion equitable relief as may be necessary in aid of its equity jurisdiction in habeas cases. *See SEC v. Vision Commc'ns, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996) (noting that the All Writs Act "empowers a district court to issue injunctions to protect its jurisdiction"); *see also Hilton v. Braunskill*, 481 U.S. 770, 775 (1987) (noting that centuries of tradition confirm that federal judges have "broad discretion in conditioning a judgment granting habeas relief"); *see* 28 U.S.C. § 2243 (directing courts to "dispose of [a habeas case] as law and justice require"); *Carafas v. LaVallee*, 391 U.S. 234, 239 (1968) ("mandate [of § 2243] is broad with respect to the relief that may be granted"); *Jones v.*

*Cunningham*, 371 U.S. 236, 243 (1963) (habeas "never has been a static, narrow, formalistic remedy").

The Court also has broad and specific authority to order appropriate relief under *habeas corpus,* including relief in the nature of bail or parole, addressed to the condition or maintenance of the prisoner prior to final resolution of the *habeas* petition. *Baker v. Sard*, 420 F.2d 1342, 1343 (D.C. Cir. 1969) (noting that a district court has "an inherent power to grant relief *pendente lite*, to grant bail or release, pending determination of the merits" and that "[r]elease is available in a habeas corpus action, which is a civil collateral attack"); *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001) (citing to *Baker*, 420 F.2d at 1343); *Ostrer v. United States*, 584 F.2d 594, 596 n.1 (2d Cir. 1978); *Boyer v. City of Orlando*, 402 F.2d 966, 968 (5th Cir. 1968) (ordering the release of a habeas petitioner on bail pending exhaustion of state and federal remedies). In addition, the writ of habeas corpus has long dealt with movement of prisoners. *See, e.g.*, *United States v. Mauro*, 436 U.S. 340, 357 (1978) (power to issue writs of habeas corpus includes authority to issue such a writ when it is necessary to bring a prisoner into court to testify or for trial or to remove a prisoner in order to prosecute him in the proper jurisdiction where offense was committed).

In light of the D.C. Circuit's June 20 ruling in *Parhat*, the near-certainty of terrible harm to their psychological well-being, and astonishing length of these imprisonments, Petitioners have an urgent need, which cannot be remedied at law, to be protected from further exposure to the harsh regime of Camp 6. On information and belief, accommodations for Petitioners are immediately available in Camp 4. Camp 4, on information and belief, (i) already houses eleven

of the Uighurs[8] (ii) permits prisoners to live communally in a bunk-house arrangement, and (iii) represents the least restrictive imprisonment regimen currently available at JTF-GTMO.

Movement to Camp 4 would also assist with the overall goal of helping Petitioners recover from their psychological cruelty of their isolation, and readying them for transfer to the United States or an appropriate country.

**B. There is an Equitable Basis for Injunctive Relief Here.**

This case does not fall within the Federal Rules of Civil Procedure, but the Court's All Writs authority gives it power to enter injunctions as appropriate. Reference to the standard for the issuance of injunctions shows that each of the four factors to be weighed in awarding preliminary injunctive relief favors the requested injunction here: (1) the Petitioners will suffer irreparable harm if the injunction is denied; (2) no harm will be suffered by Respondents if the injunction is granted; (3) in light of the decision in *Parhat*, Petitioners are likely to succeed on the merits of their claims, and (4) there is a clear public interest in preventing the government from detaining individuals in astonishingly harsh, and potentially deadly isolation, particularly where the government has no lawful basis to detain them. *See Al-Fayed v. CIA*, 254 F.3d 300, 304 (D.C. Cir. 2001); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).

**C. Other Matters**

Pursuant to Local Rule 7(m), counsel on July 25, 2008 sought the government's consent to a grant of this relief. No consent has been given.

As the prisoners are destitute, the Court should waive any requirement for a bond.

A grant of the relief requested herein lies within the sound discretion of the Court.

[8] See footnote 4, *supra*.

Petitioners have sought this emergency relief to address only the gravest, most immediate and emergent harms they are unlawfully suffering.  Petitioners reserve all rights to seek other and further relief, and expect to seek such relief by means of further motion.

**WHEREFORE**, Petitioners request that their Motion be allowed, and that they be granted such other and further relief as may be just and proper.

Dated: July 29, 2008

COUNSEL FOR PETITIONERS:

/s/ Elizabeth P. Gilson
Elizabeth P. Gilson(Pursuant to LCvR 83.2(g))
egilson@snet.net
383 Orange Street
New Haven, CT 06511
Telephone:(203) 777-4050
Facsimile: (203) 787-3259
*Counsel to Petitioners Bahtiyar Mahnut and Arkin Mahmud*

J. Wells Dixon(Pursuant to LCvR 83.2(g))
Wdixon@ccr-ny.org
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Telephone: (212) 614-6423
Facsimile: (212) 614-6499
*Of Counsel for all Petitioners*

Susan Baker Manning
BINGHAM McCUTCHEN LLP
1120 20th Street NW, Suite 800
Washington, DC 20036-3406
Telephone: (202) 778-6150
Facsimile: (202) 778-6155

Eric A. Tirschwell (Pursuant to LCvR 83.2(g))
Michael J. Sternhell (Pursuant to LCvR 83.2(g))
Darren LaVerne (Pursuant to LCvR 83.2(g))
Seema Saifee (Pursuant to LCvR 83.2(g))
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
*Counsel to PetitionerAdel Noori*

Sabin Willett (Pursuant to LCvR 83.2(g))
Neil McGaraghan (Pursuant to LCvR 83.2(g))
Rheba Rutkowski (Pursuant to LCvR 83.2(g))
Jason S. Pinney (Pursuant to LCvR 83.2(g))
BINGHAM McCUTCHEN LLP
One Federal Street
Boston, Massachusetts 02110
Telephone: (617) 951-8000
Facsimile: (617) 951-8736
*Counsel to Petitioners Hammad Memet, Khalid Ali, and Edham Mamet*

FILED WITH THE
COURT SECURITY OFFICER
CSO: EHAGARTY
DATE: 1-22-07

[No Oral Argument Set]

UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| HUZAIFA PARHAT, *et al.*,<br>Petitioners/Plaintiffs,<br><br>v.<br><br>ROBERT M. GATES,<br>Respondent/Defendant. | Case No. 06-1397 |

**JANUARY 20, 2007 DECLARATION OF SABIN WILLETT**

Pursuant to 28 U.S.C. § 1746, I declare that the following is true and correct:

1. My name is Sabin Willett.

2. I am a partner of Bingham McCutchen LLP, counsel to the Petitioners in this case.

3. On January 14, 2007, I traveled to Guantanamo Bay. In meetings that took place from January 15-18, I learned from our clients facts that bear urgently on the merits of the Petitioners' pending motion to expedite and the Respondents' pending cross-motion for a stay.

4. In light of the circumstances of our clients' imprisonment, it was impossible for counsel to learn of these facts prior to the base visit, and, as this

declaration will show, the core facts took place after the filing of the petition in this matter.

5. In light of the base rules relative to attorney meetings and the virtual impossibility and extreme time delays inherent in mail communication, it was infeasible to draw up declarations for the clients to execute. In any event, after five years of confinement under cruel conditions, and many false assurances of imminent release, our clients exhibit signs of paranoia and mistrust of all Americans, and decline to sign any writing. Accordingly, I make this declaration on the basis of their statements made to me during out meetings.

6. On January 15, 2007, I met with petitioner Abdusemet.

7. On January 16, 2007, I met with petitioner Khalid.

8. On January 17, 2007, I met with our client Abdulnasser, a Uighur prisoner who shortly will file a petition under the Detainee Treatment Act and seek to consolidate the same with the *Parhat* petition. Abdulnasser was a habeas petitioner before Judge Urbina in 2005. He is one of the thirteen Uighurs now held at Guantanamo Bay whose circumstances, as far as the record shows, are in all material respects identical with those of each other and the five Uighur men who previously have been declared by the military to be noncombatants.

9. On January 18, 2007, I met with the petitioner Sab'r Osman.

10. Pursuant to the protective order in place in Petitioners' underlying *habeas* case, all conversations with Petitioners must be regarded as classified until and unless unclassified by the Privilege Review Team. Accordingly, I am preparing this declaration in the Secure Facility and will file it under seal.

11. Pursuant to the protective order, my notes of each client meeting were collected by our base escort, and are not available to me as I prepare this declaration in the secure facility. I was permitted to review all of the notes in Guantanamo on January 18, 2007, and make this declaration on the morning of January 20, 2007 on the basis of my best memory.

*Transfer to Camp 6*

12. Each of our clients advised us that he had been moved into Camp 6 in December, 2006. Two advised that they believed they were moved in approximately mid-December. Two thought they had been moved in late December.

13. Our firm had no notice of these transfers until our meetings from Respondents.

*Conditions at Camp 6*

14. I was admitted to Camp 6 for client visits, in small interrogation rooms, on January 17 (Abdulnasser) and January 18 (Sab'r). Camp 6 is an

imposing concrete structure, with no windows visible in the main façade. It is surrounded by multiple fences and cleared areas, and checkpoints guarded by MPs.

15. Each client described, in substantially similar terms, the new regimen of his life in Camp 6. Each client is housed alone in a cell. The cell walls, ceiling, and floor are solid metal. Each cell contains a bed, toilet, sink, and metal mirror. No cell admits any natural light or air. There are no windows or openings in the walls, floor, or ceiling, except strips of glass approximately four inches wide by twenty-four inches high in and adjacent to the metal door of the cell. The glass gives a view of an interior corridor where MPs are stationed, and of a clock.

16. Khalid described a metal panel in the door that may be opened by guards in order to shackle the prisoner, hand in a meal, or receive trash. The rooms are illuminated by bright fluorescent lights that come on and off outside the prisoner's control. All ventilation comes through an HVAC system that the clients described as both loud and cold. (After years in Guantanamo, our clients appear to be comfortable in a warmer ambient temperature than am I. During Abdusemet's meeting, which occurred outside Camp 6, he requested that the air conditioner be turned down, and appeared to be comfortable in a temperature I found uncomfortably warm. He advised they he has no control over the temperature I Camp 6).

17. Except as described below, the clients advised that they are never permitted to leave the cell. Inside the cell, the HVAC system, and the banging of doors in the facility resounding through the cell door, create a noisy and stressful environment. Each client advised that, when in the cell, he is unable to communicate with any adjoining cell through the walls. Petitioners advised that there is a small gap between the door and floor. By crouching at the door and yelling, they are able to communicate basic messages, such as "Are you all right?" but it is impossible to converse. Abdusemet, Khalid and Abdulnasser all said that they have great difficulty sleeping, and are frequently awakened by banging or shouts of MPs.

18. Inside the cell, the clients have no access to any reading material except the Koran. Once a week, an MP arrives with the "library" books, but there are few books in Uighur. Sab'r advised that they are the same books the Petitioners read more than four years ago. They have no access to magazines or newspapers. They have, of course, no television, radio, telephone or way to communicate with the outside world. They have no family visits. All meals are consumed alone, inside the cell. All prayer occurs alone, inside the cell. The prisoners are constantly watched by MPs, as they sleep, as they eat, as they defecate. Neither in the cell nor in rec time do the prisoners ever see another living thing, except MPs and the other five men in the "pod," that is, the area where the

cell is located. Except for being held by gloved-MPs during transfers, they never touch another living thing. They never see, smell, or touch plants, soil, the sea, or any creature except insects.

19.    Once in each twenty-four hour period, MPs advise the prisoner that it is "rec time," and he may come to "rec" for a two-hour period. Two clients advised that, on alternate days, this will occur during the night. Two advised that daytime rec occurs only once in *three* days. All said that the invitation to night-time rec frequently is made after 11 p.m., when the prisoner is asleep, and has been made as late as 2 a.m, according to Abdusemet and Khalid. All four petitioners advised that they typically decline rec when the opportunity is afforded at the late hour.

20.    Our base escorts granted my request to speak with a senior officer within the Staff JAG at JTF GTMO. The officer confirmed the day/night regimen, advising that it was a function of the number of prisoners in Camp 6 and the available rec space.

21.    Participating in rec involves the following process. The prisoner stands inside the cell door. An MP opens the hatch, reaches in and shackles hands and feet. The door is opened, and the prisoner is then led by two MPs through a series of metal doors that are remotely and electronically locked. The prisoner is held by the upper arm by MPs who wear rubber gloves. The space is close and

confined.  As he is being led the prisoner is sometimes able to see into the doors of the five other cells in his pod, and see who is in the cell.  Each of the men I met said that the transfer process can take as little as five minutes, or as much as twenty, depending whether the MPs at the various security doors are able to reach someone in the control room by radio.  (I was led through doors of this kind during the two days in which I was permitted to meet clients in interrogation rooms within Camp 6.  There was considerable confusion about door security, and we and our escorts on several occasions were "stranded" waiting for doors to lock or unlock).  The prisoner is then led into the rec area, where he is unshackled and left for two hours.  Following "rec," the prisoner is re-shackled and led back to his cell.  On the way back to his cell, he is permitted to shower.  Once a week, he exchanges his clothing after showering for clean clothing.  Our clients advised that during the invitation to evening rec, frequently they are pressured by MPs simply to take the shower and avoid the hassle of the transfers, and frequently they agree.

22.    I requested permission from MPs to view the rec area, but permission was denied.  The rec area was described by the Petitioners as a rectangular area, approximately 15 meters by four meters, floored with concrete, and surrounded on all sides by concrete walls two stories or more in height.  On top of the space are two levels of fencing or barbed-wire material.  The rec area in turn is divided by chain link fence into five sub-areas of approximately three by four meters.  Each

prisoner is released into one of the five sub-areas and unshackled. Several Petitioners said that the sub-areas contains a soccer ball. The Petitioner may kick the ball alone. He spends rec time alone. He may, however, converse with the prisoners in the other four sub-areas. One of our clients (I believe it was Khalid) advised that it is an offense to reach through the fence to touch one's neighbor. Sab'r advised that he was offered a board game by MPs during rec. When he asked how we could play the game with an opponent through the fence, the MP did not respond.

23. On days with daytime "rec time," the clients said they spend 22 hours alone in their cell. When rec time is at night, they typically spend twenty-four hours alone in the cell.

24. Rec time affords the Petitioner his only exposure to the outside air. When rec occurs during the day, it affords the Petitioner his only exposure to natural light. However, the height of the walls and the timing of rec makes exposure to direct sunlight infrequent. Abdulsemet said he had only seen the sun four or five times since mid-December. Sab'r said he had only seen the sun two or three times. (This was my seventh visit to Guantanamo. Even in January, bright sunlight has been the norm on each of my visits). Each petitioner expressed an urgent desire for sunlight and fresh air.

25. Abdusemet described his day as follows. Alone, he rises at about five-thirty to wash (in the sink) and pray, then returns to his bed. Breakfast arrives through the hatch at about 7. He eats alone, then returns the trash through the hatch to the MPs. Sometimes he kneels and places his mouth to the small gap between door and floor and tries to shout a greeting. Then he sits on his bed for four to six hours. He tries to read the Koran. At mid-day he washes and prays. He sits on the bed, waiting for lunch, which arrives at about one. He eats and returns the trash through the hatch. Then he sits on his bed for the afternoon, or paces. He converses with no one. He tries to read the Koran. He prays. Sometimes he hears voices in his head. When dinner arrives, he eats the dinner and returns the trash through the hatch. Then he sits on the bunk, or paces until the evening prayer. He prays. He tries to sleep. He may hear the voices. He hears the banging of doors and the rumble of the HVAC. In the middle of the night, an MP raps on the door, asking if he wants "rec time." He says, "Just the shower." Half asleep, he stands at the door and is shackled. He is led to the shower area. On the way he peers into the doors on the pod, but at night the lights are off. He showers, and then is led back to the cell. He stands at the door while he is unshackled through the hatch. He returns to bed.

26. The next day, he repeats this, except that rec time occurs during the afternoon, and he participates in it.

*Former Conditions of Confinement*

27. Each Petitioner and Abdulnasser stated that he was advised by U.S. interrogators, in the spring of 2003, that his interrogation was complete, that he was "innocent," and that he was on the "doorstep," or "gateway" to leaving. At that time, each was transferred to Camp 4. In Camp 4, the Uighurs lived communally in bunk houses surrounded by a fence. Within this small penned area, they could freely go in or out doors at any time during the day or night. They were not shackled. They ate communally at an outdoor picnic table under a tent or roof-cover. They were permitted rec time in a far larger space, and men were permitted to play soccer with each other during rec. There was no restriction on their conversation together.

28. For reasons that remain unclear to me, many of the Uighurs were later dispersed to other camps, including Camps 1, 2, and 3. Abdusemet advised that one such move was made because one of the Uighurs, who had lost a leg and did not have a prosthesis, was moved to one of the camps where, in his small caged cell, he could get himself to the toilet. Various clients have advised me that, out of solidarity, other Uighurs went with him. I am not aware of the reasons for the other transfers.

29. Conditions in Camps 1, 2 and 3 were described by clients as far more restrictive than in Camp 4. Clients were confined to cages within cell blocks.

However, the cage construction permitted them to see, speak to, hear, pray with, and console each other throughout the day and night. They were never alone, except in cases where they were disciplined for perceived infractions of camp rules. The construction of the camps and the timing of rec gave them far more access to sunlight and air, they said.

*Impact on Clients of Camp 6.*

30. The January 15 meeting was my third meeting with Abdusemet. In previous meetings, he had struck me as a kindly man, quite gentle, pleasant in affect, calm, and prone to smile and laugh. On January 15 he appeared extremely anxious. His foot tapped the floor uncontrollably. His affect was deeply sad. He refused offers of the food we had brought. He appeared to be in despair.

31. He said Camp 6 was "the dungeon above the ground." He said that when they led him into Camp 6, he recalled a movie he had once seen about a Nazi concentration camp, "a place where, when they take you in, you never come out."

32. As to who was present in Camp 6, he knew the identities only of the other five men in his pod, who did not include Khalid or Sab'r. These were the only prisoners he had seen since his arrival. When I met Khalid the next day, he too, said he was aware only of the presence of the other men in his pod. He said he did not know that Abdusemet was in Camp 6. Various of our four interviews, we

were advised that the Petitioners Hammad, Huzaifa, Jalalladin, and Abdusabour were also in Camp 6.

33.    Abdusemet asked us to communicate a message from one of the other Uighurs on his pod to his wife: "Tell her to remarry. She should consider me dead."

34.    Abdusemet asked me, "What did we do? Why do they hate us so much?"

35.    Khalid said he was deeply lonely. He said he had never experienced such isolation. He said nothing at Guantanamo or Kandahar had ever been this bad.

36.    Abdulnasser said he felt as though he were living underground, "in tunnels." He said he knew the building was above ground, but that it felt underground. He said our visit was "a single ray of light in a place of darkness."

37.    Khalid and Sab'r advised that Petitioner Hammad was on their pod and had been on a hunger strike to protest the isolation of Camp 6. On January 18, Sab'r said that the hunger strike had been "eight or nine days," and that when he saw Hammad (while Sab'r was being led to rec time), Hammad looked very thin and weak. He said he that one of the men had said in rec time that Hammad had been visited to be "given a shot."

38. I did not meet Hammad. While traveling on Friday, I was advised by my colleagues that they had met Hammad. In light of the provisions of the protective order, they were not able to communicate more than that.

39. Abdusemet, Khalid and Abdulnasser said they had been visited by a "doctor," to ask, whether they were mentally stable. Following these visits, according to Abdulnasser (who understands some English), MPs taunted him with statements like, "Are you going crazy yet?"

40. During our visit, I witnessed one MP taunt Abdulnasser, as we were being escorted away for lunch break. "I've got my eyes on you," he said. "Don't you start partying!"

41. Abdusemet advised that one of the other Uighurs on his block was "hearing voices," and had been shouting out indiscriminately. Abdusemet said the man had been punished by being required to wear the orange jumpsuit.

42. Abdusemet said, "I am starting to hear voices, sometimes. There is no one to talk to all day in my cell and I hear these voices."

*Situation Regarding ARBs*

43. We asked each of our clients about the Annual Review Board process. We asked whether they had been invited to participate, had participated, or had received a notice regarding results. Abdusemet and Khalid advised that they had never received notice of any annual review board, nor any invitation to participate

in one, nor had participated in one, nor received its results. Sab'r said that he was aware of some of the Uighurs who had been "invited out," but had declined to attend.

44.    Abdulnasser advised that he had been invited to participate in an ARB while he was in Camp 1 (he said he was held there from mid-2005 through mid-2006). He said he declined because he knew the translation was poor. He said that he received a notice about one week later. The notice was in English. There was no Uighur translation. I have observed that Abdulnasser reads some English. He said that the notice said that it had been determined that he was not a threat to the United States. He kept the notice until mid-summer, 2006, when, following the suicides on the base, all of his papers were removed by MPs. Abdulnasser said that his best memory was that he had he received the notice in approximately October, 2005.

45.    Counsel have never been advised by Respondents of this result, nor received any record of any ARB proceeding with respect to any of the Petitioners.

46.    I have studied all available CSRT records concerning Abdulnasser and the Petitioners. There is no substantial difference in the records as to their pre-Guantanamo activities.

*Statements Regarding Iraq*

47. Khalid said that after the Chinese interrogated him in 2002, he was very angry with the American interrogators, because previously they had assured him that his family details, which he had freely shared with them, would never be shared with China. The Chinese had then had his interrogation file when they interrogated him.

48. Khalid said the U.S. interrogators appeared upset that the episode had taken place. He said they explained that, "We need them to support us in attacking Iraq, and in exchange we had to give them your pictures."

49. Abdusemet described a similar encounter with U.S. interrogators after the Chinese visited him in September, 2002. He said he advised the interrogator that he felt betrayed and no longer wished to speak to the Americans. He said that the interrogator apologized to him, and explained that the order that the Chinese be permitted to the base "was not his fault," that it "came from very high in Washington." Abdusemet said it was explained to him that there were "five very powerful countries in the United Nations," that "China was one of them," and that they "had to do this" so that "China was support America in invading Iraq."

50. Sab'r said that interrogators explained to him that "it was necessary to have the big countries support in the invasion of Iraq and China was one of them."

I declare this 20th day of January, 2007, under penalty of perjury that the foregoing is true and correct.

Sabin Willett

# EXHIBIT 2
# TO PETITIONERS' JOINT MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# DECLARATION OF ELIZABETH P. GILSON

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN RE: | : | Misc. No. 08-442 (TFH) |
| | : | |
| GUANTANAMO BAY DETAINEE LITIGATION | : | Civil Action No. 05-1509 (RMU) |
| | : | Civil Action No. 05-1602 (RMU) |
| | : | Civil Action No. 05-1704 (RMU) |
| | : | Civil Action No. 05-2386 (RMU) |

**DECLARATION OF ELIZABETH P. GILSON**

Pursuant to 28 U.S.C. 1746, I declare that the following is true and correct to the best of my knowledge, information and belief:

1. I am a lawyer licensed to practice in the State of Connecticut. I serve as *pro bono counsel to* Bahtiyar Mahnut (ISN 277) and Arkin Mahmud (ISN 103), two men imprisoned since 2002 at Guantanamo Bay Naval Station, Cuba ("Guantanamo"). Mr. Mahnut and Mr. Mahmud are petitioners in the petition for *habeas corpus* styled as *Kabir v. Bush,* Civil Action No. 05-1704 (RMU).

2. I make this Declaration in support of a Joint Motion for Temporary Restraining Order and Preliminary Injunction filed by my clients and four other Guantanamo prisoners whose *habeas* petitions are captioned above. I make this Declaration based on my personal observations and on information that was provided to me by my clients in the course of our visits. There is no classified material in this Declaration.

3. Petitioners are seeking to enjoin and restrain the Respondents from detaining them in any but the least restrictive camp within the JTF-GTMO, without limitation, and precluding further imprisonment in the solitary confinement cells of Camps 5 and 6.

4. In my capacity as counsel to Petitioners Mahnut and Mahmud, I have made numerous visits to Guantanamo. On my visit on August 2, 2007 I met with one of my clients, Mr. Mahmud, in an interrogation room in Camp 6, where he was housed. Previously, the Uighur prisoners had been housed together in Camp 4, a communal facility where they could talk, recreate and mingle together freely.

5. Mr. Mahmud told me that he and the other Uighurs were all moved to Camp 6 because one or two of the men had engaged in disruptive behavior after one of the guards allegedly mishandled a Koran. He said that all 17 Uighurs were punished by the move to Camp 6, even though only one or two had been involved in the incident.

6. While the interrogation room where we met was not fitted out as a prison cell with bunk, privy, and sink, it is of the same dimensions as a Camp 6 cell: approximately 12 feet long by 6 feet 8 inches wide, by 8 feet high. A photograph of a typical cell is attached hereto as Exhibit A. I downloaded the photograph on July 24, 2008 from the website: http://cryptome.org/gitmo-121606/gitmo-121606.htm.

5. The interrogation cell is so small as to engender claustrophobia after short time. Mr. Mahmud reports that at times his cell is painfully cold.

6. During my visit on August 2 my client exhibited extreme behavior, talking in voices and shouting at me and at my translator. On previous visits, when he was in Camp 4, Mr. Mahmud typically engaged me in amazingly cordial, hopeful, and polite conversation. He was open and interested in discussing his case with me, and followed the legal developments with great interest. On those previous occasions, he did experience a few, brief, episodes where he appeared to be speaking in the voice of another, but he always recovered immediately. But on August 2 he had only a relatively few moments of calm, when I was discussing the details of his case.

7. I have discussed Mr. Mahmud's deteriorating condition with a psychiatrist (who has not examined him). I feared that Mr. Mahmud may have been suffering from schizophrenia. The psychiatrist advised me that individuals who exhibit the symptoms that I described are not psychotic, but are manifesting the signs of post-traumatic stress syndrome ("PST"). The treatment for PST is not drugs, but a change in the situation that induces the stress.

8. In June of 2008, Human Rights Watch issued a report entitled "Locked up Alone, Detention Conditions and Mental Health in Guantanamo," http://hrw.org/reports/2008/us0608/. The Report states, among other things, that such "extreme and prolonged isolation violates international legal obligations, and can aggravate desperate behavior," ultimately complicating ongoing efforts to resettle these men.

I declare this 25th day of July, 2008, under penalty of perjury, that the foregoing is true and correct.

Elizabeth P. Gilson

# EXHIBIT 3
# TO PETITIONERS' JOINT MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCITON

# DECLARATION OF SEEMA SAIFEE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: | : Misc. No. 08-442 (TFH) |
| | : |
| GUANTANAMO BAY DETAINEE LITIGATION | : Civil Action No. 05-1509 (RMU) |
| | : Civil Action No. 05-1602 (RMU) |
| | : Civil Action No. 05-1704 (RMU) |
| | : Civil Action No. 05-2386 (RMU) |

**DECLARATION OF SEEMA SAIFEE**

Pursuant to 28 U.S.C. § 1746, I declare that the following statements are true and correct to the best of my knowledge, information and belief:

1. I am an attorney at Kramer Levin Naftalis & Frankel, a law firm in New York, and *pro bono* counsel for Adel Noori (Internment Serial Number 584), who has been detained at the U.S. Naval Station in Guantánamo Bay, Cuba since 2002.

2. Mr. Noori is a petitioner in the petition for a writ of habeas corpus styled *Mohammon v. Bush*, Civil Action No. 05-2386.

3. This declaration is based upon a series of attorney-client interviews with Mr. Noori that I conducted between October 2007 and June 2008 and unclassified government documents.[1] All statements made in this declaration are unclassified.

4. Mr. Noori was cleared for release from Guantánamo as early as 2003. The Department of Defense publicly confirmed Mr. Noori's clearance for

[1] Paragraph 8 of this declaration is based on legal mail from another Kramer Levin client, Abdulghappar Abdulrahman, who is also a petitioner in *Mohammon v. Bush*, Civil Action No. 05-2386.

release for the first time on March 7, 2007. A copy of the correspondence from the Department of Defense is attached as Exhibit 1 to this declaration.

5.    During one of my visits to Guantánamo, Mr. Noori showed me a release paper he received from the military dated August 6, 2007. I copied verbatim the language that appeared on this document. The document, which was stamped "unclassified," stated in pertinent part as follows: "An ARB [Administrative Review Board] has reviewed the information about you that was talked about at the meeting on 4 August 2005 and the deciding official in the United States has made a decision about what will happen to you. You have been authorized for transfer from Guantanamo Bay. While your transfer has been authorized, the date of such transfer depends on the United States reaching an agreement with your country of origin or another country to accept you."

6.    Although Mr. Noori has been approved for release from Guantánamo, he has been imprisoned – for approximately one year – in "Camp VI," a maximum-security facility where he remains in solitary confinement for most of the day.

7.    Mr. Noori told me that the conditions of his indefinite imprisonment became significantly worse after he was moved to Camp VI.

8.    During a visit on June 20, 2008, Mr. Noori told me that two Uighurs in Camp VI attempted to commit suicide by hanging themselves. To my

knowledge, this is the first time any Uighur has attempted to take his own life at Guantánamo.

9.    In the fall of 2007, another Kramer Levin client, Abdul Razakah, went on a severe hunger strike in Camp VI that lasted over 60 days. In a letter to his lawyers that was intended for public dissemination, one of Kramer Levin's other clients, Abdulghappar Abdulrahman, stated that Abdul Razakah starved himself in response to the military's refusal to move him to a better-conditioned camp to alleviate his health problems. After Abdul Razakah went on hunger strike, the military shackled and force-fed him twice a day. Abdulghappar stated that Abdul Razakah's hunger strike demonstrates the severe measures to which the Uighurs imprisoned in Camp VI are being driven. Abdul Razakah has since been moved to Camp IV. A copy of the letter from Abdulghappar Abdulrahman and an English translation of that letter are attached as Exhibit 2 to this declaration.

10.    The psychological effects of prolonged solitary confinement have been profound on Mr. Noori. During my last visit with him, Mr. Noori expressed the view that he might never be released alive to see his daughter again. During that same visit, Mr. Noori told me and my colleague to spend as much time with him as possible because we might not see each other again. He said that if the military continues to hold him in Camp VI, he will no longer meet with his attorneys.

11. Based on Mr. Noori's statements to me, and my personal observations, I strongly believe that housing Mr. Noori in Camp VI – one of the most restrictive camps at Guantánamo – is causing his psychological and physical well-being to rapidly deteriorate, and is interfering with our attorney-client relationship. Mr. Noori has been cleared for release. At the very least, he should be housed in the least restrictive facility available at Guantánamo. Continuing to house Mr. Noori in Camp VI – as illustrated by the recent suicide attempts by two Uighurs – places Mr. Noori's life at grave risk.

I declare, under penalty of perjury under the laws of the United States, that to the best of my knowledge the foregoing statements are true and correct.

Executed this 28th day of July, 2008

Seema Saifee

# EXHIBIT 1

**Saifee, Seema**

---

**From:** Wells Dixon [WDixon@ccr-ny.org]
**Sent:** Monday, July 30, 2007 12:40 PM
**To:** Saifee, Seema
**Subject:** FW: Detainee Status Notification

J. Wells Dixon
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, New York 10012
(212) 614-6423
(212) 614-6499 (fax)
wdixon@ccr-ny.org

---

**From:** Lee, Robert LTCOL OARDEC, CYTW [mailto:robert.lee8@navy.mil]
**Sent:** Wednesday, March 07, 2007 2:35 PM
**To:** Wells Dixon
**Subject:** Detainee Status Notification

Dear Counsel for ISN 584

Through either the Administrative Review Board (ARB) process or the process DOD had in place prior to ARBs, your client has been approved to leave Guantanamo, subject to the process for making appropriate diplomatic arrangements for his departure. Accordingly, any prior guidance regarding submission of materials for a 2007 ARB for your client is inapplicable to this detainee; he will not be receiving another ARB proceeding.

As you know, such a decision does not equate to a determination that your client is not an enemy combatant, nor is it a determination that he does not pose a threat to the United States or its allies. I cannot provide you any information regarding when your client may be leaving Guantanamo as his departure is subject to ongoing discussions.

ROBERT LEE, Lt Col, USAFR
Deputy Staff Judge Advocate
DOD HQ OARDEC
Office for the Administrative Review of the Detention of Enemy Combatants
Washington, DC

# EXHIBIT 2

TOTAL P.03

UNCLASSIFIED

- ئابدۇغاپپار، ئابدۇ[illegible]

ياخشىمۇسىلەر J. Wells Dixon ئەپەندى ۋە Seema Saifee خېنىم، سىلەر [illegible] بۇرۇن [illegible] يېشىپ پارسا كەن. بىز تۈركىستانلىقلارنىڭ ئىشلىرىغا ئارتۇق پايدىسى بولسىكەن دېگەن ئۈمىدتە مەن.

بىز تۈركىستانلىقلار ھەممىمىز تۈركىستاندىن جۇڭگو ھۆكۈمىتىنىڭ كۈندىن كۈنگە كۈچىيىۋاتقان زۇلمىدىن ۋە بىزگە [illegible] ھەر خىل [illegible] بىلەن تۈرمىلەرگە تاشلاپ [illegible] ۋە ھەر خىل بوھتانلار بىلەن خەلقنى بولۇپمۇ ياشلارنى [illegible] قورقۇنچ [illegible] ياشاش ۋە [illegible] ئاللاھقا ياناھ ئىزلەپ چەتكە چىقىشقا مەجبۇر بولدۇق. بىز گۇۋانتانامودىكى ئۇيغۇرلارمۇ ئەنە شۇلارنىڭ جۈملىسىدىن. ياناھ ئىزلەپ ئەتراپىتىكى مۇستەقىل دۆلەتلەرگە چىقتۇق ۋە ھەر خىل سەۋەبلەر بىلەن ئافغانىستانغا كەلگەن ئىدۇق. بىزنىڭ ئافغانىستانغا كەلگەندە ئامېرىكا ئارمىيەسى ئافغانىستانغا ھۇجۇم قىلىپ كىردى. بىزگە ئافغانىستاندا تۇرۇشقا جاي قالمىغاندىن كېيىن بىز [illegible] پاكىستانغا چىقتۇق. پاكىستان خەلقى بىزنى تۇتۇپ پاكىستان ھۆكۈمىتىگە تاپشۇردى، پاكىستان ھۆكۈمىتى بىزنى ئامېرىكا ئارمىيەسىگە ساتتى ئامېرىكا ئارمىيەسى بىزنى بۇ يەرگە ئېلىپ كەلدى. بىز [illegible] دەسلەپكى سوراقتىن [illegible] دەپ [illegible] بۇ مەسىلە ئامېرىكا ھۆكۈمىتىگە ۋە ئامېرىكا ئارمىيەسىگە ۋە مۇناسىۋەتلىك ئورۇنلارغا ئېنىق. دېمەك تۈركىستان خەلقى ۋە گۇۋانتانامودىكى ئۇيغۇرلار تارىختىن بۇيان ھېچقاچان ئامېرىكا بىلەن ئۆچمەنلىكتە بولۇپ باقمىغان، بولۇشى مۇمكىن ئەمەس. چۈنكى بىزنىڭ ۋەتىنىمىز باشقىلار تەرىپىدىن بېسىۋېلىنغان باشقىلارنىڭ ياردىمىگە موھتاج خەلقمىز.

بىز دەسلەپتە تۇتۇلۇپ پاكىستان ھۆكۈمىتى بىزنى ئامېرىكا ھۆكۈمىتىگە ئۆتكۈزۈپ بەرگەندە [illegible] بولغان ۋە ئامېرىكا ھۆكۈمىتىدىن بىزگە مەسىلىنى ئېنىقلاپ ۋە ياردەم بېرىدۇ دەپ ئۈمىد قىلغان ئىدۇق ئەپسۇس ئۈمىدسىز بولدى. بىزنى 2004 ۋە 2006-يىللىرى گۇناسىز دەپ ئېلان قىلغان بولسا بىز 6 يىل بولدى يەنىلا تۈرمىدە ئولتۇرۇۋاتىمىز. تۈرمىدە نېمە ئۈچۈن يېتىۋاتقانلىقىمىزنى بىلمەيمىز. بىز يەنىلا ئامېرىكا ھۆكۈمىتى بىزنى تېزلا تۈرمىدىن چىقىرىپ ياخشى جايغا ئورۇنلاشتۇرۇشىدۇ دېگەن ئۈمىدتە مىز.

[illegible] ئايرىلىپ ۋە يەنە سىرتقى دۇنيادىن پۈتۈنلەي ئالاقە ئۈزۈلگەندىن [illegible] كۆپ [illegible] مەھرۇم بولغاندىن سىرت تۆت ئەتراپى پۈتۈنلەي تۆمۈرنىڭ ئىچىدە ياشاش [illegible] مۇناسىپ كەلمەيدىكەن. مېنىڭ بۇرۇنقى سالامەتلىكىم ناھايىتى ياخشى ئىدى، [illegible] 6-تۈرمىگە ئېلىپ كېلىنگەندىن بۇيان قول ۋە پۇتۇمدا رىماتىزىم پەيدا بولۇپ كۈندىن كۈنگە كۈچىيىۋاتىدۇ. [illegible] ئەتراپىدا بولدى [illegible] ئاغرىقى [illegible]. ۋە [illegible] ئابدۇرازاقنىڭ بۇرۇندىن [illegible] رىماتىزىم كېسىلى بار ئىدى. 6-تۈرمىگە كەلگەندىن بۇيان تېخىمۇ كۈچىيىپ كەتتى. ئابدۇرازاق [illegible] 8-ئاينىڭ بېشىدا ئامېرىكا ئارمىيەسى تەرىپىدىن تۈرمىدىن چىقىپ كەتسە بولىدۇ دېگەن [illegible] تەخىر [illegible]. شۇنىڭ ئۈچۈن ئابدۇرازاق [illegible] تۈرمىدە [illegible] ئاچلىق ئېلان قىلغان ئىدى ھازىر [illegible] ھازىر 20 كۈندىن ئاشتى كۈنىگە ئىككى قېتىم [illegible] قالغان بىلەن [illegible] ئارقىلىق [illegible] (

UNCLASSIFIED

JAN-15-2008 14:26

ۋرنىدىن نشىلەنكە ئارقىلىق مەجبۇرى ئوزۇقلاندۇرىۋاتىدۇ. ئۇزۇن مۇددەت تاماق يېمەسلىك يېستىكە بويداق موئامىلە ئىنسان ئۈچۈن ئاسان ئىش ئەمەس، بۇنى ئابدۇرازاق ھەرگىز خالىمايتى كەن نىرۋەردىكى موئامىلە ئابدۇرازاقنى مەجبۇر قىلدى. ئەتراپىدىكى زۇلۇم مەجبۇر قىلمىسا كىم [illegible] ئاتقان ئۆلۈشتا كۆرۈشنى تاشلايدۇ؟ ئامرىكا قانۇنىدا بىر ئادەم ئۆزىنىڭ سالامەتلىكىنى ۋە غالىپتى ۋە ھوقۇقىنى تەلەپ قىلىش جىنايەت ھېساپلىنامدۇ؟ ئەگەر بۇ جىنايەت ھېساپلانسا ۋە [illegible]لارنىڭ قانۇنى بىلەن نىمە پەرقى. ئىككىسى دۇنيانى [illegible] كىشىلەرنىڭ تۇتقان سىياسىتى بىلەن

UNCLASSIFIED

نىمە پەرقى قالىدۇ؟

ئىشلىتىلگەن [illegible] 4- ۋە 5- تۈرمىدە ئاشۇنداق باستۇرۇپ كىرىشى جەريانىدا مەسىلىق بىر ئادەمنىڭ [illegible] ئۆلۈپ كېتىشى مۇمكىن بولغاندىن كېيىن دۆلەتكە ئاپىشتورۇپ بىر سەلدى يەنە سەۋەبىنىڭ ئادەمنىڭ قولى سۇندى. مەن ئەنسىرايمەن ئابدۇرازاقمۇ ئاشۇنداق ئاقىۋەتكە ئۇچرىسا ياكى تاماق يېمىگەن ئادەمگە كۈنگە ئىككى قېتىم باستۇرۇپ كىرىپ ئاغلاپ ئەپچىقىش ئايلار داۋاملاشمىسا ئابدۇرازاقنىڭ [illegible] چاتاق چىقىپ قالارمۇ دەپ ئەنسىرەۋاتىمەن ھازىر نۇرغۇن تۈرمىدە نىمە ئىشلار بولۇپ قالدى، بىز تۈرمىدە نىمە ئىچۈن ئۆزىمىز ياتىمىز؟ بىز تۈرمىدە [illegible] ۋە نىجى ئاتىقى [illegible] ۋە سالامەتلىكىمىزدىن ئايرىلغاندىن ئاندىن چىقىدىغان [illegible] تۈركىستانىلىقلاردىن بىر نەچچە كىشى تۈرمىدە ئۆلۈشكە ئەرەك ئوتتۇرىدا [illegible] بولغانلا باشقىلار بىزنىڭ مۇسۇلمان [illegible] تۈرمىدىكىلەرنى ئويلايدۇ دەپ ئويلايدىغان بىر قالدىم.

بۇ خەتنى بىزنى [illegible] ئىسلامىتىڭ ۋە سىلەرنىڭ باشقا قانۇنى ئورۇنلارنىڭ موشۇ مەسىلىنى قولىشىشلىرى ۋە ئەمەلى ياردەم بېرىشلىرى ئۈمىد قىلىمەن

ئابدۇغاپپار تۈركىستانى ‹281›

2007-يىل 12-ئاينىڭ 12-كۈنى

گۇئانتانامو تۈرمىسى 6-تۈرمە

UNCLASSIFIED

2

How are you Mr. J. Wells Dixon and Ms. Seema Saifee?

I hope that this letter reaches you before you come over and I hope that it would be a little beneficial for our Turkistani brothers' situation here.

We, the Turkistani brothers left our homeland in order to escape from the brutal suppression and unfair treatment from the Chinese government toward our people. The Uyghur youth back home were either being incarcerated with false accusations or being prosecuted and executed with bogus allegations. It was extremely difficult for any Uyghur to see a future for themselves within our homeland and young and middle aged Uyghurs started to leave East Turkistan and try to find survival abroad if anyone could find a way to get out. We, the Uyghurs in Guantanamo, are also like those Uyghurs, we left our homeland for the same cause and sought endurance within our neighboring countries. As you know, for some specific reasons we have ended up in Afghanistan. When we have arrived in Afghanistan, the US army raided Afghanistan. We had to leave to Pakistan since we could not stay in Afghanistan and as we also did not know anyone who could help us there, we had no other choice but to leave. The Pakistani people arrested us and turned us over to the Pakistani government. Subsequently, the Pakistani government sold us to the US army for bounties. The US Army brought us to Guantanamo. Since the very beginning of the interrogations, we have been saying this. Our circumstances are very clear to the US government, US army and related agencies. Thus, the East Turkistani people and we, the Uyghurs in Guantanamo, have never had any revulsion against the US at any time and it never would be possible at any time because, our homeland is being occupied and we need help of the others.

We were very pleased at the beginning when the Pakistanis turned us over to American custody. We sincerely hoped that America would be sympathetic to us and help us. Unfortunately, the fact was different. Although in 2004 and 2005 we were told that we were innocent, however, we are being incarcerated in jail for the past 6 years until present. We fail to know why we are still in jail here. We are still in the hope that the US government will free us soon and send us to a safe place. Being away from family, away from our homeland, and also away from the outside world and losing any contact with anyone, also being forbidden from the natural sunlight, natural air, being surrounded with a metal box all around is not suitable for a human being. I was very healthy in the past. However, since I was brought to Camp 6, I got rheumatism and my joints started to hurt all the time and are getting worse. My kidney started to hurt for the past 10 days. My countryman Abdulrazaq used to have rheumatism for a while and since he came to Camp 6, it got worse. Sometime in early August, the US army has told Abdulrazaq that he is cleared to be released and also issued the release arrival in writing to him. Hence, Abdulrazaq requested to move him to a better conditioned camp for his health reasons and when it was being ignored he started to go on hunger strike for over a month now. Currently, he is on punishment and his situation is worse and he is being shackled down to the chair and force fed twice a day by the guards, that wear glass shields on their faces, for the past 20 days. For someone who has not eaten for a long time, such treatment is not humane. Abdulrazaq would never want to go on hunger strike however the circumstances here forced him to do so as he had no other choice. If the oppression was not unbearable, who would want to throw himself on a burning fire? In the US constitution, is it a crime for someone to ask to protect his health and ask for his rights?

If it does count as a crime, then what is the difference between the US constitution and communism constitution?  What is the difference with Hitler's policies during the second World War?

I have heard that an Egyptian man broke his back and became handicapped while he was being handled by such team in Camp 1 or 2 and then he was sent home as a crippled person for the rest of his life.  Another Libyan broke his arm also.  I worry that Abdulrazaq would face a similar or worse situation while being force fed twice a day for a long time and I am also concerned for his psychological condition as it is extremely difficult for him to keep his mental state normal with such circumstances.  Recently, I started to wonder, why are we staying in this jail for so long?  I wonder if we will be released after we damage our internal and external organs and arms and legs.  Or is it necessary for a few Turkistanis to die as it happened in the past here in this jail in order to gain others' attention and their concern toward our matter?  Such thoughts are in my mind all the time.  The reason I am writing this letter to you is that, I sincerely hope you and related law and enforcements solve this issue quickly and help us in a practical manner.

Abdulghappar Turkistani (281)
December 12, 2007.

Guantanamo Bay jail, Camp 6.